Melnychenko *v.* 84 Lumber Company.

LEONID LENNY MELNYCHENKO & others[1] *vs.* 84 LUMBER
COMPANY.[2]

Hampden. October 9, 1996. - February 18, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, &
MARSHALL, JJ.

*Employment,* Sexual harassment, Discrimination, Termination, Retaliation.
*Anti-Discrimination Law,* Sex, Employment. *Practice, Civil,* Findings by
judge. *Statute,* Construction.

A claim alleging sexual harassment, as defined in G. L. c. 151B, § 1, and
prohibited by § 4(16A), is permissible without reference to the question
of gender or sexual orientation of the alleged harasser. [288-290]
O'CONNOR, J., dissenting, with whom LYNCH, J., joined.

The record of a claim brought against an employer alleging sexual harass-
ment, as defined by G. L. c. 151B, § 1(18), and prohibited by G. L.
c. 151B, § 4(16A), fully warranted the judge's findings that the plaintiffs'
male supervisor had engaged in verbal and physical conduct of a sexual
nature unreasonably interfering with the three male plaintiffs' work per-
formance by creating an intimidating, hostile, humiliating and sexually
offensive work environment [286-288]; and the record supported the
judge's further conclusion that such conduct interfered with the
plaintiffs' right to be free from unreasonable, substantial, or serious
interference with privacy, as stated in G. L. c. 214, § 1B [290-291].
O'CONNOR, J., dissenting with whom LYNCH, J., joined.

In a claim by a discharged employee seeking damages from the former
employer for the employer's alleged retaliatory conduct in violation of
G. L. c. 151B, § 4(4), the judge's findings supported his conclusion that
retaliation was not a determinative factor in the plaintiff's discharge
[293-294]; and the plaintiff did not make any showing of harm from the
employer's actions allegedly in violation of G. L. c. 151B, § 4(4A) [293-
295].

CIVIL ACTION commenced in the Superior Court Depart-
ment on June 14, 1991.

The case was heard by *Daniel A. Ford,* J.

[1]James Quill and Stephen LaRochelle.

[2]At the commencement of trial, the plaintiffs voluntarily dismissed their
action against individual defendants named in the complaint, Richard Raab
and Eliasel Roque.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jay M. Presser* for the defendant.

*Charles V. Ryan* (*Timothy J. Ryan* with him) for Leonid Lenny Melnychenko.

*Clifford Heaton*, for Stephen LaRochelle, was present but did not argue.

*Mary Lisa Bonauto & Nan Evans* for Gay & Lesbian Advocates & Defenders & others, amici curiae, submitted a brief.

*Scott Harshbarger*, Attorney General, *& Catherine Ziehl*, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

WILKINS, C.J. A judge in the Superior Court ruled that Richard Raab, an employee of the defendant corporation at its West Springfield store, engaged in "sexual harassment," as defined in G. L. c. 151B, § 1 (18), and that it did not matter what Raab's sexual orientation was or whether Raab intended to have a sexual relationship with any of the plaintiffs, all of whom are male. The principal issue in this case is whether same-sex sexual harassment is prohibited by G. L. c. 151B, § 4 (16A), regardless of the sexual orientation of the parties. We agree with the trial judge that such conduct falls within the statutory definition of sexual harassment, and is, therefore, prohibited by G. L. c. 151B, § 4 (16A). We also consider a cross appeal from that part of the judgment that denied relief from claimed retaliatory conduct of the defendant.[3]

1. Chapter 151B of the General Laws states that it is an unlawful practice for an employer, as defined in G. L. c. 151B, § 1 (5), "to sexually harass any employee." G. L. c. 151B, § 4 (16A). Sexual harassment as defined in G. L. c. 151B includes "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" which has "the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." G. L. c. 151B, § 1 (18) (*b*).

The judge ruled that Raab's "revolting and positively outrageous" conduct had the purpose or effect of unreasonably

---

[3]We transferred the defendant's appeal and the cross appeal to this court on our own motion.

interfering with all three plaintiffs' work performance by creating an intimidating, hostile, humiliating, and sexually offensive work environment. The judge concluded that Raab engaged in "verbal and physical conduct" of a sexual nature and that his conduct was totally unwelcome by the plaintiffs. The judge's subsidiary findings of fact, significant portions of which we set forth in the margin,[4] fully warranted the judge's ultimate findings.

The defendant argues that the finding that the plaintiffs were sexually harassed was clearly erroneous. The defendant bases its argument on the facts that the plaintiffs continued to

---

[4] "9. Melnychenko, Quill and LaRochelle had each worked for 84 Lumber for approximately two weeks when Raab started to harass them. He grabbed all three of them by their genitals, and fondled their buttocks. He squeezed their chests, rubbed them in areas of the body commonly thought private, and touched them 'everywhere.' He exposed himself to Melnychenko and Quill on at least three occasions, and asked them to give him a 'blow job.' . . . He told Melnychenko that if Melnychenko did not give him a 'blow job,' he could start looking for other work. He also told other store employees that he and Melnychenko were engaging in sex. On several occasions Raab bear hugged Melnychenko and Quill from behind, and pretended to be having anal intercourse with them. He told other employees that he had been having sex with Quill, and one day he announced over the store public address system that Quill had given him a 'blow job.' One day, Quill was suffering from hemorrhoids, and was having a hard time walking. He told Raab about his problem, and asked to be allowed to go home early. Raab refused to allow him to go home. Instead, Raab announced over the store public address system that Quill 'had been fucked too hard' on the previous evening. He also kicked Quill on his buttocks on at least four occasions that day, causing Quill considerable pain. In addition, Raab told other employees that he was sexually involved with Quill's girlfriend, and that she 'likes it up the ass.'

"10. Another store employee, Eliasel Roque (hereafter 'Roque'), frequently joined with Raab in these hijinks. He also grabbed, squeezed and rubbed Melnychenko and Quill in private areas of their bodies. On one occasion, Raab exposed himself, and Roque forced Quill's head to within a foot of Raab's penis, as if Roque were about to force Quill to perform oral sex on Raab. On most occasions when Roque did these things, Raab was present.

". . . .

"13. I find that Raab's actions were not true romantic overtures to the plaintiffs, and that they were not inspired by lust or sexual desire. He did not wish to engage in serious sexual relationships with any of them. In some cases, I find that Raab intended his actions to constitute nothing more than 'horse play.' On other occasions, however, I find that Raab was physically violent and sadistic, that he intended to degrade and humiliate

"socialize" with Raab and failed to complain of Raab's conduct, despite complaining about other employment-related events. The judge found, however, that LaRochelle and Melnychenko did complain to the defendant's area manager and that Quill was afraid of losing his job if he complained. The record does not lead us to the definite and firm conviction that the judge was mistaken in any of his findings. See *Kendall* v. *Selvaggio,* 413 Mass. 619, 620-621 (1992); Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996).

We come then to the question whether G. L. c. 151B, § 4 (16A), applies to same-sex sexual harassment, even where the perpetrator of the harassment may be a heterosexual. Relying heavily on Federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1994), the defendant argues that sexual harassment is only actionable as a form of sex discrimination, and that, therefore, the only form of same-sex sexual harassment that is prohibited by G. L. c. 151B is sexual harassment perpetrated by a homosexual. The dissent, sounding the same tune, seems to assume that, if we were to follow Federal law in this case, the result would be different. That is not certain. The Federal authorities are hardly in accord on the issue of same-sex sexual harassment.[5] In any event, we arrive at our own conclusions in construing our own statute. See *Blare* v. *Husky Injec-*

---

the plaintiffs, and that he acted purely out of malevolence and spite; he knew that his actions bothered the plaintiffs greatly, and in several cases he behaved as if he derived pleasure from the plaintiffs' discomfort. In any event, I find that *all* of Raab's physical touchings and sexual innuendos were unwelcome by the plaintiffs, and that his conduct had the effect of unreasonably interfering with the plaintiffs' work performance by creating an intimidating, hostile, humiliating and sexually offensive work environment.

". . . .

"15. The sexual harassment of Quill was constant. It began approximately two weeks after he started work, and occurred almost daily. On some occasions, it happened 3 or 4 times in one day. In Melnychenko's case the harassment started approximately two weeks after he was hired and continued throughout the period that he worked in the West Springfield store. He was harassed approximately 2 times per week. In the case of LaRochelle, the abuse was much less frequent. It did, however, become more frequent over the course of time." (Emphasis in original.)

[5]Some Federal courts have either explicitly held, or simply assumed, that same-sex harassment claims are permissible under Title VII without refer-

*tion Molding Sys. Boston, Inc.*, 419 Mass. 437, 441 (1995); *College Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 163-164 (1987); *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 167 (1978).

It is particularly appropriate for us to reach our own conclusions where, as here, the relevant sections of G. L. c. 151B differ significantly from Title VII of the Federal act. Of particular importance for the disposition of this issue is the fact that the Legislature specifically defined sexual harassment and, at the same time, codified the prohibition against it. Subsection 18, defining "sexual harassment," was inserted in G. L. c. 151B, § 1, by St. 1986, c. 588, § 2. Subsection 16A, making an unlawful practice of sexual harassment, was

ence to the question of sexual orientation. See, e.g., *Quick* v. *Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (same sex sexual harassment may be actionable under Title VII without regard to sexual orientation of harasser); *Morgan* v. *Massachusetts Gen. Hosp.*, 901 F.2d 186, 192 (1st Cir. 1990) (assuming male employee had cause of action under Title VII for sexual harassment against male coworker); *Tanner* v. *Prima Donna Resorts, Inc.*, 919 F. Supp. 351, 354-355 (D. Nev. 1996) (holding that "same-sex sexual harassment claims are actionable under Title VII" as matter of law, and furthermore that "the sexual preference of the harasser is irrelevant to a Title VII claim"); *Nogueras* v. *University of P.R.*, 890 F. Supp. 60, 63 (D.P.R. 1995) (where female employee alleged that she was harassed by female supervisor and coworker, court simply held that "same-sex harassment is an unlawful employment practice" under Title VII and that *"[d]efendants'* gender is irrelevant" [emphasis in original]); *Polly* v. *Houston Lighting & Power Co.*, 825 F. Supp. 135, 137 (S.D. Tex. 1993) (reviewing decisions of other Federal courts, and "assuming, without deciding, that Title VII does apply to sexual harassment of a male by his male coworkers"). See also *Cummings* v. *Koehnen, 556 N.W.2d 586, 590 (Minn. Ct. App. 1996) (Minnesota Human Rights Act "prohibits unwelcome verbal or physical conduct or communication of a sexual nature that creates an intimidating, hostile, or offensive work environment, without regard to the harasser's or victim's gender or sexual orientation").

Other Federal courts have barred *all* same-sex sexual harassment claims under Title VII, while some have permitted these claims where the claimant can demonstrate that the alleged harasser is a homosexual. Compare *Oncale* v. *Sundowner Offshore Servs., Inc.*, 83 F.3d 118, 120 (5th Cir. 1996) (same-sex harassment never actionable under Title VII), cert. denied, 117 S. Ct. 2508 (1996) and *Garcia* v. *Elf Atochem N. Am.*, 28 F.3d 446, 451-452 (5th Cir. 1994), with *Wrightson* v. *Pizza Hut of Am.*, 99 F.3d 138, 141 (4th Cir. 1996) ("claim under Title VII for same-sex 'hostile work environment' harassment may lie where the perpetrator of the sexual harassment is homosexual").

inserted in G. L. c. 151B, § 4, by St. 1986, c. 588, § 3. There is no parallel Federal statutory language. It is under subsection 16A that the trial judge ruled that the defendant had engaged in an unlawful practice.

Sexual harassment as defined in § 1 (18), and prohibited by § 4 (16A), is not limited to conduct of a supervisor aimed at a subordinate of the opposite sex, nor is it limited to same-sex conduct only where the harasser is a homosexual. Rather, any physical or verbal conduct of a sexual nature which is found to interfere unreasonably with an employee's work performance through the creation of a humiliating or sexually offensive work environment can be sexual harassment under G. L. c. 151B. The judge found that Raab's conduct fell within the statutory definition and correctly concluded that the plaintiffs were entitled to recover damages as a result.

The dissent is correct in noting that c. 151B concerns unlawful discrimination. The Legislature, in language not found in the Federal act, has defined sexual harassment so as to be included within "[d]iscrimination on the basis of sex . . . ." G. L. c. 151B, § 1 (18). Verbal or physical conduct of a sexual nature, even if it does not include "sexual advances" or "requests for sexual favors," comes within the statutory definition of sexual harassment. *Id.* Thus, sexual harassment as defined in § 1 (18) is by legislative direction a form of sexual discrimination. Contrary to the dissent's view, nowhere is discrimination because of a victim's sex made an essential element of a sexual harassment claim in Massachusetts.[6]

The judge also ruled that Melnychenko and Quill had

---

[6]In *Smith* v. *Brimfield Precision, Inc.,* 17 M.D.L.R. 1089 (1995), a commissioner of the Massachusetts Commission Against Discrimination stated that:

> "It is of significant import that G. L. [c.] 151B, §§ 1 (18) and 4 (16A) define and prohibit sexual harassment in the workplace without reference or regard to gender. These provisions exist *in addition to the prohibitions of sex discrimination outlined in G. L. [c. 151B, § ] 4 (1).* Given the above, I find it consistent with the language and intent of the statute to find that a claim of same-gender harassment will lie under G. L. [c.] 151B." (Emphasis supplied.)

*Id.* at 1096. In arriving at this conclusion in a case factually comparable to the one before us, the commissioner noted the disagreement among the

proved that the defendant had interfered with their right to be free from unreasonable, substantial, or serious interference with privacy, as stated in G. L. c. 214, § 1B. To avoid duplicative damages the judge awarded only one dollar to each on this claim. He based his conclusion on the facts set forth in the latter half of paragraph 9 of his findings and quoted in note 4 above. The defendant argues only that it should not be liable because Raab's conduct in making certain announcements in the workplace about Melnychenko's and Quill's sexual conduct was outside the scope of Raab's employment. There is no merit to this contention. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 165-167 (1987). Raab's misconduct occurred at the defendant's place of business while he held a supervisory position. There was, moreover, evidence that the defendant received complaints about Raab's treatment of LaRochelle and Melnychenko.

2. We turn now to Melnychenko's appeal from the judge's determination that the defendant is not liable to him for retaliatory conduct forbidden by G. L. c. 151B.[7] To present the basis of the claim of retaliation, we set forth additional findings by the judge.

In October, 1990, the plaintiff Quill left the defendant's employment. Shortly thereafter, Quill told Melnychenko that he was going to file a complaint about Raab's conduct and asked Melnychenko to provide Quill's attorney with an affidavit concerning events at the defendant's store. Not long after Melnychenko provided a supporting affidavit, the defendant's general counsel "asked him to come to the defendant's corporate headquarters in Pennsylvania and meet with the defendant's general counsel and chief operating officer. The defendant's officers expressed disappointment that Melnychenko had given Quill's attorney an affidavit without telling them because it exposed the company to liability. They

Federal courts on this issue, and ruled that to exclude same-sex harassment from the protection of c. 151B would be "unduly restrictive." *Id.*

[7]Quill also appealed from this ruling. Because Quill had already left the company's employment when the alleged retaliation against Melnychenko occurred and he makes no showing that his case was adversely affected by the alleged retaliation, his appeal lacks merit.

LaRochelle's brief presents the same issue. He did not cross-appeal, and his brief makes no attempt to explain how he was harmed by any alleged retaliation against Melnychenko.

told Melnychenko not to speak with either Quill or his attorney. The officers also told Melnychenko "that they would not be able to protect him or to guarantee his physical safety" at the company's West Springfield store and that he should, therefore, accept reassignment. Melnychenko agreed and reported to the defendant's Orange Park, Florida, store about one week after the meeting in Pennsylvania. Approximately one month later, Melnychenko wrote a hostile letter to the company's chief operating officer complaining that the company had not fulfilled certain promises to him.

About the same time, the defendant's Florida area manager offered Melnychenko a temporary promotion to the position of merchandising manager because Melnychenko had been doing a good job at the Orange Park store. The area manager told Melnychenko that, when the temporary job was completed, he would be in line for a comanager's job. Because there were no guarantees, Melnychenko refused the promotion.

Thereafter, the area manager received reports that (a) Melnychenko had been telling other company employees that the general counsel was a liar and that the company had broken its promises to him and (b) Melnychenko was giving a bad impression to customers. The area manager reported these facts to the chief operating officer, who concluded that Melnychenko was never going to be content as long as he worked for the defendant and advised the area manager that Melnychenko's employment would have to be terminated. The judge made a specific finding concerning Melnychenko's termination: The defendant "has proven by clear and convincing evidence that Melnychenko was terminated, not in retaliation for his having given the affidavit to Quill's attorney, but because he had become a disgruntled employee who was openly expressing his negative feelings about [the company] to both customers and fellow employees and therefore was no longer an asset to the company."

The defendant's general counsel gave the area manager a written termination agreement and told him to offer Melnychenko $5,000 if he would sign it. That agreement provided that Melnychenko could "not counsel or assist in the prosecution of claims against [the company], whether those claims are on behalf of [Melnychenko] or others, unless [Melnychenko] is under a court order to do so." The agreement

also provided that, "if any inquiries are made concerning [Melnychenko's] termination . . . [Melnychenko] . . . will respond by indicating . . . that [Melnychenko] . . . was treated fairly by [the company] . . . and that [Melnychenko] has every reason to believe [the company] thinks highly of [Melnychenko]."

The area manager told Melnychenko that "he was being terminated because he was 'bad mouthing' the company, and was adversely affecting the morale of store employees. He gave the termination agreement to Melnychenko and offered him $5,000.00 to sign it. Melnychenko read the agreement, and said that he was not sure he could sign because he had already given an affidavit about things that had happened in the West Springfield store. He asked if he could bring the agreement home and show it to others for their advice. [The area manager] responded that he could not, and that he had to make his mind up then and there. Accordingly, Melnychenko refused to sign the agreement, and did not receive the $5,000.00. His employment with [the company] was terminated on that day."

Melnychenko, in presenting his claim of retaliatory conduct, relies on two definitions of unlawful practices in G. L. c. 151B, § 4. Under § 4 (4), it is unlawful for any employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or assisted in any proceeding under [§ 5]." Section 4 (4A) makes it an unlawful practice "[f]or any person to coerce, intimidate, threaten or interfere with another . . . person for having aided or encouraged any other person in the exercise or enjoyment of any . . . right granted or protected by this chapter." In his ultimate findings and rulings the judge did not distinguish between the two subsections. Indeed, he did not cite § 4 (4).

Melnychenko argues that the company violated § 4 (4) by firing him. He had the burden of proving that the company's decision to fire him was based on its desire to retaliate against him for assisting Quill or for his complaining about Raab's conduct. *Tate* v. *Department of Mental Health*, 419 Mass. 356, 364 (1995). The judge found that the defendant did not terminate Melnychenko either in retaliation for anything that he did, or to impede or interfere with Quill's claim. He further found that "Melnychenko was fired because he was

openly accusing [the company's chief operating officer] of being a liar, he had written a highly inappropriate letter to [the chief operating officer], he was adversely affecting the morale of other store employees, and [the chief operating officer] understandably believed that, no matter what else [the company] did for him, Melnychenko was never going to be happy with [the company]. Accordingly, [the chief operating officer], with no input from [the company's legal counsel], decided that Melnychenko had to be terminated."

Certainly, these findings present a nondiscriminatory reason for firing Melnychenko. Although there was evidence warranting the conclusion that the firing was retaliatory, that evidence did not compel such a finding. We, therefore, decline to overrule the judge's conclusion that retaliation was not a determinative factor in Melnychenko's discharge.

Melnychenko argues further that the defendant violated § 4 (4A) by its treatment of him during and following the meeting in Pennsylvania. At that meeting, two officers of the company complained that Melnychenko had given an affidavit to Quill's lawyer and told Melnychenko not to talk with Quill or his lawyer about this matter. They said that the company could not protect Melnychenko if he remained employed at the West Springfield store and that he should accept a transfer to another store. Later, in Florida, the company offered Melnychenko $5,000 to sign the termination agreement containing provisions barring Melnychenko from assisting in the prosecution of his own or anyone else's claim against the company and mandating that he would represent, contrary to his opinion, that he had been well treated by the company.

The judge concluded that the transfer to Florida, to which Melnychenko agreed, was done to remove him from an obviously unworkable situation and to rehabilitate Melnychenko's career with the company. The judge stated: "I further find that [the general counsel's] attempt to obtain Melnychenko's signature on a termination agreement in exchange for $5,000.00 was merely a clumsy and poorly thought out effort to protect [the company] from liability. As misguided as the effort might have been, I do not attribute any sinister or ille-

gal motives to [the general counsel], and I conclude that it did not constitute a violation of G. L. c. 151B."[8]

There was evidence that would have warranted a finding that the company attempted to "interfere" with Melnychenko for having aided Quill in the exercise of his rights protected by G. L. c. 151B.[9] The company was unsuccessful, however, in its attempt to dissuade Melnychenko from helping Quill. Melnychenko did not sign the termination agreement which was certainly designed to interfere with the presentation and adjudication of unfair practices claims under G. L. c. 151B. The company's instruction to Melnychenko not to speak with Quill or his attorney, and the attempt to obtain a termination agreement from Melnychenko, might have been acts designed "to coerce, intimidate, threaten, or interfere" with Melnychenko for having aided Quill. But these attempts by the defendant sought to control Melnychenko's future conduct, and the portion of § 4 (4A) on which Melnychenko relies concerns retaliation for past assistance to a person, such as Quill, who is seeking to exercise a right under G. L. c. 151B. Melnychenko makes no showing that the defendant retaliated against him for his past assistance to Quill in a way that caused him more harm than is reflected in the damages already awarded to him. We need not, therefore, consider whether G. L. c. 151B applies to the company's conduct in dealing with Melnychenko in Pennsylvania and Florida.

3. The judgment is affirmed. Counsel for Melnychenko and Quill are entitled to reasonable attorney's fees and costs in connection with the defendant's appeal. See G. L. c. 151B, § 9; *Yorke Mgt.* v. *Castro*, 406 Mass. 17, 20 (1989). LaRochelle's brief is verbatim the same as the brief submitted by the other plaintiffs. The question of attorney's fees and costs for LaRochelle shall be decided by a single justice of this court. *Id.*

*So ordered.*

O'CONNOR, J. (dissenting, with whom Lynch, J., joins). It

[8]Section 4 (4A) does not require proof of either a sinister or an illegal motive.

[9]Melnychenko does not rely on G. L. c. 151B, § 4 (5), concerning, in part, an employer's attempt to abet or compel the doing of an act forbidden by G. L. c. 151B.

is conceivable, although not likely, that a heterosexual male could be biased against other males simply because they are males, and could respond to that prejudice by engaging in sexually offensive speech or behavior resulting in an unreasonable interference with the other males' work performance. See G. L. c. 151B, §§ 1 (18) and 4 (16A). If those had been the facts of this case, I would agree that the plaintiffs would be entitled to damages under c. 151B. Discrimination, which is what G. L. c. 151B is all about, would have been established. Here, however, sexual discrimination was not established, that is, the plaintiffs did not prove that they were sexually harassed *because* of their gender. They did not establish *discriminatory* sexual harassment, as required, I believe, by c. 151B. Reading c. 151B as a whole and taking into account relevant statutory history, I am confident that the Legislature's single concern in enacting c. 151B and adding to it by amendment has been the elimination of discrimination in the workplace based on race, color, creed, national origin, sex, sexual orientation, or ancestry. See G. L. c. 151B, § 4 (1). It is significant in this case, therefore, that the trial judge found the defendant's agent's conduct to have been intended sometimes as "horse play" and sometimes "to degrade and humiliate" the plaintiffs, but not to have been motivated by the plaintiffs' gender. *Ante* at 287-288 n.4.

A reading of G. L. c. 151B as a whole, with an awareness of its history, makes clear that it is an antidiscrimination statute patterned after the Federal antidiscrimination statute, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (1994), as construed by the Federal Equal Employment Opportunity Commission (EEOC) in its "Guidelines on Discrimination Because of Sex," 29 C.F.R. § 1604.11(a) (1996). Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." By a 1980 amendment to its Guidelines on Discrimination Because of Sex, which the court's opinion ignores, the EEOC provided as follows:

> "(a) Harassment on the basis of sex is a violation of § 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct

of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individuals, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 45 Fed. Reg. 74,677 (Nov. 10, 1980).

In *Meritor Sav. Bank, FSB* v. *Vinson,* 477 U.S. 57, 64-66 (1986), the Supreme Court endorsed that guideline as a proper interpretation of Title VII, observing that "[w]ithout question, when a supervisor harasses a subordinate *because of the subordinate's sex,* that supervisor 'discriminate[s]' on the basis of sex" (emphasis added). *Id.* at 64. The Supreme Court stated: "Since the Guidelines were issued, courts have uniformly held, and we agree, that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66.

The court makes the point that "the relevant sections of G. L. c. 151B differ significantly from Title VII of the Federal act." *Ante* at 289. The court also observes: "Subsection 18, defining 'sexual harassment,' was inserted in G. L. c. 151B, § 1, by St. 1986, c. 588, § 2. Subsection 16A, making an unlawful practice of sexual harassment, was inserted in G. L. c. 151B, § 4, by St. 1986, c. 588, § 3. There is no parallel Federal statutory language." *Ante* at 289-290. My response is that c. 151B, §§ 1 (18), and 4 (16A), *do* parallel Title VII as construed by the relevant Federal agency, the EEOC, in 29 C.F.R. § 1604.11 (a), quoted above. Clearly, in construing Title VII, the agency's focus was on discrimination, including discrimination by means of sexual harassment. Surely, that fact could not have gone unnoticed or have been ignored by the Massachusetts Legislature when, six years after the EEOC's aforementioned guideline was published, and following the Supreme Court's decision in *Meritor Sav. Bank, FSB* v. *Vinson, supra,* the Legislature amended G. L. c. 151B, § 1, by adding the following subsection 18:

"The term 'sexual harassment' shall mean sexual ad-

vances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (*a*) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (*b*) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment." St. 1986, c. 588, § 2.

In comparing 29 C.F.R. 1604.11 (a) with G. L. c. 151B, § 1 (18), this court has recognized that "the Massachusetts Legislature . . . adopted the same definition." *Gnerre* v. *Massachusetts Comm'n Against Discrimination*, 402 Mass. 502, 508 n.4 (1988). The Legislature would have been very explicit, which it was not, if it intended the term "sexual harassment" in c. 151B to have a different meaning from the one EEOC gave to it in its Guidelines, that is, to include in the Massachusetts antidiscrimination statute a prohibition against nondiscriminatory sexual harassment not to be found in the Federal law.

Under the statute, sexual harassment includes "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." G. L. c. 151B, § 1 (18) (*b*). It is hard to conceive of sexual advances or requests for sexual favors that would not be discriminatory, that is, "because of" the sex of the "victim." I would construe the words "other verbal or physical conduct of a sexual nature" also as referring to discriminatory conduct, that is, action taken "because of" the victim's sex. That would make the statute internally consistent and consistent with the Federal law after which it was patterned and would require a different result from the one reached by the court in this case.

The court states, *ante* at 290, "The Legislature, in language not found in the Federal act, has defined sexual harassment so as to be included within '[d]iscrimination on the basis of sex . . . .' G. L. c. 151B, § 1 (18)." The court's position appears to be that the Legislature defined not only discriminatory sexual harassment, but also nondiscriminatory sexual harassment, as discrimination on the basis of sex. I would be

reluctant to conclude that the Legislature intended to include nondiscriminatory conduct within its definition of discrimination.

I offer one final argument relative to G. L. c. 151B: A plaintiff who wishes to pursue a claim of sexual harassment is required by law to bring that complaint to the Massachusetts Commission Against Discrimination (commission). See 804 Code Mass. Regs. § 1.03 (1993). Such complaint shall contain: "(a) . . . identification of the . . . person(s) alleged to have committed unlawful *discriminatory* acts . . . (b) the date(s) on which such unlawful *discriminatory* acts occurred . . . [and] (c) a concise statement of the alleged *discriminatory* acts" (emphasis added). 804 Code Mass. Regs. § 1.03 (4). Today the court holds that a plaintiff who alleges sexual harassment and who necessarily brings his or her claim to the commission and avers discriminatory acts, as he or she must, may prevail on that claim notwithstanding the fact that he or she has not been the victim of discrimination at all. Neither good sense nor the history and development of this area of the law warrants such a result.

General Laws c. 151B, § 1 (18) (*b*), provides in relevant part: "The term 'sexual harassment' shall mean . . . verbal or physical conduct of a sexual nature when . . . (*b*) such . . . conduct ha[s] the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment." For the reasons I have stated, I would construe the words "conduct of a sexual nature" as referring to conduct that results from the actor's attitude about the victim's gender. If, as the judge's findings make clear, that is not the situation here, that is, Raab's (employer's agent) conduct toward the plaintiffs was not motivated by the fact that the plaintiffs are males, there was no "conduct of a sexual nature" within the meaning of c. 151B, § 1 (18), and therefore it is immaterial that his conduct may have had "the purpose or effect" described in § 1 (18) (*b*).

After discussing the G. L. c. 151B "sexual harassment" claim, the court briefly addresses the judge's ruling that the defendant, 84 Lumber Company, had interfered with the plaintiffs' "right to be free from unreasonable, substantial, or

serious interference with privacy, as stated in G. L. c. 214, § 1B." *Ante* at 290-291. After noting that "[t]he defendant argues only that it should not be liable because Raab's conduct in making certain announcements in the workplace about Melnychenko's and Quill's sexual conduct was outside the scope of Raab's employment," *ante* at 291, the court states: "There is no merit to this contention. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination,* 400 Mass. 156, 165-167 (1987). Raab's misconduct occurred at the defendant's place of business while he held a supervisory position. There was, moreover, evidence that the defendant received complaints about Raab's treatment of LaRochelle and Melnychenko." *Ante* at 291. The court cites no other case and expresses no other rationale for its disposition of the interference with privacy, G. L. c. 214, § 1B, issue.

I also shall be brief. There was no mention of G. L. c. 214, § 1B, in *College-Town, supra. College-Town* interpreted G. L. c. 151B, § 4 (1), not G. L. c. 214, § 1B, and concluded that "[b]y the terms of G. L. c. 151B, § 4 . . . College-Town [was] liable for discrimination committed by [one of its supervisors]." *Id.* at 167. The court explained that "General Laws c. 151B, § 4, prohibits discrimination by 'an employer, by himself or his agent.' Furthermore, G. L. c. 151B, § 9, provides that '[t]he provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof . . . .' " *Id.* at 165. In my view, neither the language of G. L. c. 151B nor its interpretation by the court dictates or even suggests that an employer is liable for interference with privacy protected by G. L. c. 214, § 1B, committed by an employee acting outside the scope of his employment. The court's opinion does not make clear whether, in its view, under G. L. c. 214, § 1B, the conduct complained of must be within the course of employment. It is clear to me that it must, but was not in this case. The fact that these incidents took place at the defendant's place of business and that the defendant received related complaints falls far short of justifying an inference that Raab's conduct was intended to further the defendant employer's interest or was otherwise in the course of employment. There was no proof nor finding in this case that Raab's offensive conduct was within the scope of his employment. I would reverse the judgment for the plaintiffs and order the entry of judgment for the defendant.