Hines, J.
Introduction
The plaintiff, Tahona Core-Boykin, has been employed by the defendants, Boston Edison Company (“Boston Edison") and NSTAR Gas and Electric Corporation (“NSTAR”)[1] since 1985. On April 12, 1999, plaintiff filed a charge of discrimination in the MCAD. She filed a second charge alleging retaliation on September29, 1999. On November 28,2001, Core-Boykin filed this Complaint alleging gender discrimination (Count I), sexual harassment (Count II), race discrimination (Count III), retaliation (Count IV), and “combination gender-race-retaliation” discrimination (Count V). The defendant filed this motion for summary judgment as to all counts. For the reasons set forth below, the motion is DENIED in part and ALLOWED in part.
BACKGROUND
From the evidence in the summary judgment record, considered in the light most favorable to the plaintiff, a jury could find the following facts. Plaintiff has been continuously employed by Boston Edison since 1985, first as a Substation Operator and since 1994 as an Operating Mechanic. In 1986, plaintiff was invited to participate in the Operating Mechanic Apprentice Program. Successful completion of the apprenticeship required plaintiff to perform numerous on-the-job-training (“OJT’) tasks from level 1 through level 12 and to pass written examinations to demonstrate her competency at each stage of the training. After completion of the training, Core-Boykin expected to graduate to the position of Qualified Level 12 Grade B Operating Mechanic (“Qualified Operating Mechanic”). Once so qualified, Core-Boykin would enjoy all the attendant perquisites and benefits, including a degree of autonomy in performing the required duties. Core-Boykin was the only black female *578 in her division and reporting area and the first black female Operator Mechanic to be supervised by John Rabbit.
The transition from apprentice to Qualified Operating Mechanic was difficult for Core-Boykin. Her supervisor, Rabbit, was responsible for overseeing the training and testing necessary for plaintiff to graduate to the Qualified Operating Mechanic position. At various times along the way, however, Rabbit resisted assigning plaintiff the required tasks. When CoreBoykin did perform OJT tasks, Rabbit refused on some occasions to review them for proficiency. Frustrated with the delay on one particular task, Core-Boykin sought the assistance of the union steward who arranged for another supervisor to review the plaintiffs work. This supervisor, who happened to be a black male, signed Core-Boykin’s OJT sheet certifying that she had performed the required tasks. When Rabbit learned about the signing of the OJT sheet, he attempted to persuade Edison to reject the black supervisor’s signature. His efforts failed when Edison decided to accept the signature and credit CoreBoykin with the tasks.
On January 22, 1999, Core-Boykin was scheduled to take an OJT examination. On the day of the examination, however, Rabbit ordered Core-Boykin to appear for a random drug test.[2] Core-Boykin perceived this order as another example of Rabbit’s efforts to frustrate her advancement. Nonetheless, she followed Rabbit’s order and went instead to take the drug test. Later that day, Rabbit spoke to Core-Boykin sharply, accusing her of insubordination and threatening a reprimand for her refusal to take the drug test. After some discussion, Core-Boykin persuaded Rabbit that she had in fact taken the test and the matter was dropped. Core-Boykin felt humiliated by Rabbit’s conduct and saw it as another example of a pattern of hostile treatment because of her sex and race. Thereafter, on April 12, 1999 Core-Boykin filed her first charge of gender and race discrimination with the MCAD.
On April 28, 1999, Core-Boykin requested in writing an OJT assignment involving wiring circuits and removing old gaskets. Core-Boykin understood that this would be the last assignment before taking the final OJT test. Even though Rabbit is a licensed electrician, an Edison supervisor responded that no licensed electricians were available to oversee this task. Instead, Core-Boykin was sent to a construction unit where, she was told, she needed to go to complete the task. It was not until August 20, 1999 that plaintiff was able to complete the OJT exam. Until that time, she was an “unqualified Level 12" which meant that she had to work under the "tag" of a qualified Level 12.
Shortly after her assignment to the construction unit and after the filing of her discrimination charge at the MCAD, a clay penis appeared in the window. Core-Boykin was offended by the object. After it remained on display for several weeks, she removed it from view. She delivered it to her attorney who in turn complained to Edison. Edison initiated an investigation during which Core-Boykin was required to describe the offending phallus in front of her male co-workers. At a follow-up sexual harassment training meeting, plaintiff became upset and left because she perceived that the form and content of the meeting exacerbated the conditions she was then facing. The co-workers suspected of having installed the phallus were present at the training. In addition, some of Core-Boykin’s co-workers expressed to her their unhappiness at having to appear at sexual harassment training “because of [her] complaints.” Thereafter, Core-Boykin received the “silent treatment” from her co-workers.
At the same time that Core-Boykin was experiencing difficulties in making the transition from apprentice to Qualified Operating Mechanic, she was being subjected to harassment and disparate treatment by her supervisors and co-workers. She alleges a series of incidents, many of which are not disputed by the defendant,[3] in which she was targeted for harassment because of her sex and/or race. In 1994, a supervisor referred to Core-Boykin as a “dark cloud” over his head. In 1996, plaintiffs tools were stolen from her lockbox while she was out on leave. Her supervisor, John Rabbit, had a key to her lockbox giving him access to her tools. Until Boston Edison replaced the tools, she was assigned to non-technical janitorial duties such as cleaning the bathroom and sweeping the floors. In 1998, Core-Boykin’s purse containing her Boston Edison identification card was stolen while she was at work. Although Rabbit would not allow her to use company time to obtain a new photo identification card, he granted this privilege to white male employees. In March 1998, Core-Boykin requested that Rabbit allow her to work on her day off and take off another day so that she could take her daughter to a heart specialist. Rabbit denied her request even though he allowed similar requests from white or male employees. Also, since at least 1998, Core-Boykin was denied overtime on an equal basis with her white, male co-workers. When Core-Boykin returned from maternity leave in June 2000, she was the only employee who did not have a working phone or pager. Without a working phone or pager, she had to drive off-site to a pay phone for instructions and then return to the work-site to complete her assigned task. Additionally, because Core-Boykin was not supplied with the same fire retardant clothing supplied to her white male co-workers, she was required to work without this necessary precaution. In the fall of 2000, a co-worker referred to Core-Boykin and a black female contractor as “cocoa puffs” and “bitches.”
DISCUSSION
A court will grant summary judgment where there are no genuine issues of material fact and where the *579 moving party is entitled to judgment as a matter of law. Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may also satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of her case at trial. Flesner v. Technical Comm. Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991). If the moving party meets this burden, the opposing party may not rely upon his pleadings or bald conclusions but must respond with specific facts showing that there is a genuine issue for trial. LaLonde v. Eissner, 405 Mass 207, 209 (1989).
Notwithstanding these general summary judgment principles, this court is mindful of the caution that summary judgment is disfavored in disparate treatment discrimination cases. In these cases, the ultimate issue of intent almost always depends on disputed facts. Blare v. Husky Injection Molding Sys. Boston, Inc, 419 Mass. 437, 439 (1995). Nonetheless, summary judgment is not automatically precluded in disparate treatment discrimination cases and should be granted in appropriate cases. Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1992).
The defendant raises several arguments in support of this motion for summary judgment: (1) many of the plaintiffs claims are time-barred; (2) the plaintiff has suffered no adverse employment action; (3) facts in the summary judgment record are insufficient as a matter of law to prove a claim either sexual harassment or retaliation; and (4) plaintiffs “combined” race and sex discrimination claim should be dismissed because G.L.c. 15 IB does not permit such a cause of action. I will address each of these arguments in turn.
The Statute of Limitations Challenge
Plaintiff filed the first discrimination charge at the MCAD on April 12, 1999. She filed a second charge alleging retaliation on September 29, 1999. Plaintiffs Complaint was filed in this court on November 28, 2001. A person who brings a charge of discrimination in the MCAD must do so within six months of the alleged unlawful act. G.L.c. 15 IB, §5. If, thereafter, a party elects to file a complaint in the Superior Court, she must do so within three years of the alleged act of discrimination. G.L.c. 151B, §9.
The defendant argues that plaintiffs claims are time-barred because only one alleged discriminatory act, the January 1999 incident involving Rabbit’s “sharp words” about the drug test, occurred within the six-month interval prior to the filing of the first discrimination charge on April 12, 1999. According to defendant’s logic, therefore, none of the other alleged discriminatory acts occurring before October 12, 1998 (the six-month cut-off date) may be considered because plaintiff failed to file a timely charge of discrimination as to any of those acts. I disagree.
Defendant acknowledges that a plaintiff may rely on the continuing violation rule if she shows “within the six-month limitation the existence of at least one incident, which standing alone might not necessarily support her claim, but which substantially relates to earlier incidents of abuse, and substantially contributes to the continuation of a hostile work environment, such that the incident anchors all related incidents, thereby making the entirety of the claim for discriminatory conduct timely.” Cuddyer v. Stop and Shop Supermarkets, Inc., 434 Mass. 521, 533 (2001). Despite this language favoring a liberal approach to this issue, defendant argues that the January 22, 1999 incident cannot be a predicate for the application of the continuing violation rule because it is unrelated in kind to any of the other prior incidents enumerated in the MCAD charge and in the Complaint.
Taken together, the January 22, 1999 incident involving Rabbit’s unfounded accusation against Core-Boykin and the additional seventeen allegations of harassment might reasonably be seen by a jury as cut from the same cloth of hostility based on Core-Boykin’s sex and race. A jury could find that disparate treatment or hostility based on race and/or sex are common elements in a significant number of the alleged acts. These common elements bind together the various acts to establish a pattern of discriminatory conduct sufficient to meet the continuing violation test. Lastly, defendant’s de minimis characterization of the January 22, 1999 incident as merely “sharp words” does not differentiate it from the earlier conduct. It is Rabbit’s alleged race-and sex-based animus, not the words alone, that constitutes discrimination.
Defendant also argues that Core-Boykin cannot avail herself of the continuing violation rule because she knew as early as 1989 that the conduct she complains of was discriminatory. The evidence in the summary judgment record does not support this argument. In Cuddyer v. Stop & Shop Supermarket Co., 434 Mass, at 539, the court specifically rejected this “revelatory” standard for determining statute of limitations issues in sexual harassment cases. Instead, the court expressly approved the application of continuing violation doctrine in cases where, as here, the plaintiff has alleged relevant conduct within the six-month period “unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, and, thus a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on the conduct.” Id. at 539. This rule is intended, of course, to favor the right of a plaintiff to pursue her claim and it “allows her to litigate alleged, otherwise *580 time-barred, acts of sexual harassment unless her delay in initiating the lawsuit, considered under an objective standard, was unreasonable.” Id. at 540.
Ajury could find that Core-Boykin’s decision to wait until April 12, 1999 to file her discrimination charge was objectively reasonable. Part of the consideration in filing a charge is that discrimination is not necessarily proved by one or even a series of acts. A plaintiff seeking to file a claim based on hostile environment would likely be advised that the law does not favor discrimination charges in such cases. In addition, it is also clear that Core-Boykin would likely have been told, after seeking legal advice in the matter, that a charge was not ripe unless and until the conduct could be shown to affect the terms and conditions of her employment. It might also be argued that in spite of the long history of hostility and harassment, CoreBoykin had an epiphany in January 1999 when Rabbit ordered her to take a drug test instead of the planned OJT competency test. It was then that she understood that her long struggle to advance to Qualified Operating Mechanic would not be made easier by accepting what she perceived to be unjustified and unnecessary delays in getting to the final examination. Based on the evidence, therefore, ajury could conclude that the January 22, 1999 incident triggered Core-Boykin’s decision to seek legal recourse for her situation, and that the incident “furnished the catalyst for her full comprehension that a pattern of long-standing discrimination existed that was unlikely to be successfully remedied.” Cuddyer v. Stop & Shop Supermarkets, 434 Mass, at 540.
Adverse Employment Action
The evidence in the summary judgment record adequately demonstrates an adverse employment action. Under Chapter 151B, §4, it is unlawful for an employer to discriminate because of race or gender in compensation, or in terms, conditions or privileges of employment. The defendants recount the plaintiffs numerous allegations and argue that none of the acts, even if true, affected the plaintiffs job status, pay grade, or any other conditions of her employment. Defendant is correct that a plaintiff must present more than “subjective feelings of disappointment and disillusionment,” Bain v. City of Springfield, 424 Mass. 758, 766 (1997), quoting MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996), and that a plaintiff must present “objective evidence that [she has] been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment.” Id. at 766. In my judgment, however, this test has been met.
Without even weighing the cumulative effect of the various allegations of discriminatory conduct, plaintiffs assertion that she was deprived of the opportunity to earn overtime income on a par equal to her white male co-workers suffices as an adverse employment consequence. Defendant concedes this point but argues that Core-Boykin’s evidence on this issue is “unsubstantiated speculation.” The facts of record, including the overtime records presumably produced by defendant, establish a measurable disparity in the distribution of overtime. If credited by a juiy, the evidence that plaintiff was denied overtime opportunities adequately establishes that she was “materially disadvantaged" in the terms and conditions of her employment. A worker’s salary, including the opportunity for overtime pay, is clearly a condition of employment that cannot be impaired on account of gender or race. MacCormack v. Boston Edison Co., 423 Mass, at 663. Accordingly, defendant’s argument that plaintiff suffered no adverse employment action fails.
The Sexual Harassment Claim
The plaintiff alleges a gender-based claim for sexual harassment (Count II) pursuant to G.L.c. 151B, §4(16A). To prove a claim of sexual harassment the plaintiff must establish the following: a) that she was subjected to conduct of a sexual nature; b) the conduct was unwelcome; c) the conduct had the purpose or effect of creating an intimidating, hostile humiliating or sexually offensive work environment; and d) the conduct unreasonably interfered with [her] work performance or altered the terms and conditions of [her] employment." College-Town, Div. of Interco, Inc. v. Massachusetts Comm’n Against Discrimination, 400 Mass. 156, 162 (1987); Ritchie v. Department of State Police, 2004 Mass.App. LEXIS 297. In clarifying the burden of proof for sexual harassment or hostile work environment discrimination, the applicable cases hold that a party must prove that the conduct is objectively and subjectively offensive. Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411-12 (2001). In addition, the requirement of interference with the plaintiffs work performance or an alteration in the terms and conditions of the employment means that the plaintiff must prove conduct sufficiently pervasive to have that effect. College Town v. Massachusetts Comm’n Against Discrimination, 400 Mass, at 162. Cuddyer v. Stop & Shop Supermarket Co., 434 Mass, at 532. The flaw in a claim based on a single event is that the underlying conduct simply does not rise to the level of conduct so pervasive as to create a “formidable barrier to full participation ... in the workplace.” College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass, at 156. Defendant argues that Core-Boykin’s reliance on the one incident involving the clay penis is insufficient to establish a sexual harassment claim based on hostile work environment. After examining the evidence of record in light of the statute and the cases, I agree.
Though it is theoretically possible to prove hostile environment based on a single act of harassment, this is not such a case. In Gnerre v. Massachusetts Comm’n Against Discrimination, 402 Mass. 502 (1988), the court declined to impose a numerosity requirement in the proof of sexual harassment. At the same time, the *581 court made clear that the threshold is quite high for one-act sexual harassment claims. Only “very threatening behavior or sexual harassment involving physical contact” will suffice as proof of sexual harassment when a single act is alleged. Id. at 508-09. The display of an object resembling a penis, however offensive it may be, clearly does not meet this test. It involves neither threatening conduct nor physical contact. The fact that it remained on display for several weeks does not change this conclusion; it was still a single act. The flaw inherent in non-pervasive single act conduct is apparent here. There is no evidence in this record that the presence of the object was so worrisome that Core-Boykin was unable to report for work or that once present, she was unable to participate fully in discharging her duties.[4] Nothing in this record shows that the object was even discussed by anyone working at the site or that there was no attempt to force attention to the object in CoreBoykin’s presence. Finally, no evidence suggests that this object was placed in the window in the context of an overtly sexual atmosphere. Therefore, the display of the object alone, is insufficient to prove a hostile environment claim based on sexual harassment.
The subsequent events involving Edison’s investigation and employee training on the issue do not transform this incident into a valid hostile environment claim. The investigation and training events are not “sexual” in nature and would not, in any event, be probative of sexual harassment as defined by G.L.c. 151B, §1(18). See Melnychenko v. 84 Lumber Company, 424 Mass. 285 (1997) (sexual harassment requires conduct of a “sexual nature”). Id. at 290. I distinguish conduct of a “sexual nature” from the more typical discrimination in the terms and conditions of employment based on “gender.”
The Retaliation Claim
Under G.L.c. 151B, §4(4), it is unlawful for an employer to “discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint . . . under section five.” In bringing her claim under this statute, the plaintiff is obligated to prove a “change in working conditions that materially disadvantaged [her]” and that the change is causally related to the filing of her complaint. MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996); Sahli v. Bull HN Information Systems, Inc., 437 Mass. 696 (2002). Defendant argues that Core Boykin’s retaliation claim is barred because she failed to prove either an adverse employment action or a causal relationship between the protected activity and the adverse employment action.[5] Neither of these arguments is meritorious.
First, defendant’s claim that the record lacks proof of adverse employment consequences is addressed and rejected above. This analysis extends to the conduct alleged to have occurred after the filing of the complaint. In a workplace setting where rank and pay are at stake, the unjustified delay in accommodating Core-Boykin’s completion of the final requirements for the transition to Qualified Operating Mechanic is an adverse employment action. Other post-filing conduct also meets the “adverse” requirement. On April 27, 1999 within weeks after the filing of the MCAD charge, Core-Boykin was assigned extra duties and janitorial tasks stereotypically associated with women’s work. In addition, after a July 9, 1999 “tagging” incident in which Core-Boykin refused to place her tag on a job for which she was not then qualified, Rabbit reprimanded her. The reprimand with the attendant loss of pay and the disparate assignment of duties are not merely “subjective feelings of disappointment and disillusionment.” MacCormack v. Boston Edison, 423 Mass, at 663. Both are adverse employment consequences that materially disadvantaged Core-Boykin and, therefore, support Core-Boykin’s retaliation claim.
The facts in the summary judgment record also support a finding of a causal relationship between these adverse consequences and the filing of the discrimination charge. Core-Boykin asserts a series of incidents after the notice to Edison of the filing of her discrimination charge in the MCAD on April 12, 1999. The temporal proximity of these incidents to the filing of the discrimination charge coupled with the lack of a cogent justification for the actions taken against Core-Boykin support an inference of a causal relationship. A jury could reasonably conclude that Edison delayed Core-Boykin’s April 28, 1999 “gasket” supervision request, submitted barely two weeks after the filing of the charge, as retaliation. This request related to Core-Boykin’s complaint about the pace of the her advancement to Qualified Operating Mechanic, the very issue raised in her charge. The reprimand for Core-Boykin’s refusal to place her tag on the job might well be explained to the jury in the context of retaliation rather than a legitimate employer action. This is especially so where Core-Boykin acted in compliance with Edison policy in refusing to tag a job for which she was not qualified and where the supervisor himself refused to issue a direct order to Core-Boykin to tag the job. All of these acts, occurring in close proximity to the filing of the discrimination charge and having no clear or objective justification, support CoreBoykin’s retaliation claim. See Tate v. Department of Mental Health, 419 Mass. 356, 364 (1995) (plaintiff must prove that the employer’s desire to retaliate was a determinative factor in the adverse actions taken by the employer).
The Combination Race-Gender Discrimination Claim
Finally, this Court finds nothing in Massachusetts case law or statutes that prohibits a discrimination claim under Chapter 151B that alleges combination discrimination. Other courts have recognized such *582 claims. See e.g., Lam v. Univ. of Haw., 40 F.3d 1551, 1562 (9th Cir. 1994) (allowing a combination claim and stating that “the attempt to bisect a person’s identify at the intersection of race and gender often distorts or ignores the particular nature of their experiences”); Hicks, 833 F.2d at 1416; Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir. 1983); Jefferies v. Harris County Cmty. Action, 615 F.2d 1025, 1034 (5th Cir. 1980) (recognizing black females as a separate protected class). Additionally, although in a different context (juror selection), the Supreme Judicial Court has recently recognized the existence of combined race-gender groups as “discrete groups deserving of protections similar to those extended to discrete groups defined exclusively by race or gender.” Commonwealth. v. Jordan, 439 Mass. 47, 60-61 (2003) (holding that art. 12 proscribes the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in a group delineated by race and gender). Accordingly, this Court is unwilling to conclude that Chapter 151B precludes combination claims.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment is DENIED insofar as it seeks dismissal of Counts I, III and IV. The motion is ALLOWED as to Count II.

Boston Edison merged with NSTAR in 2000. For the purposes of this memorandum, I refer to the defendant as “Edison.”

The parties dispute whether Rabbit scheduled the drug test to prevent Core-Boykin from taking the OJT exam. Rabbit claims that he was following orders in directing Core-Boykin to take the drug test and that he had no discretion to change the date of the test. Core-Boykin alleges that the order for the test was dated January 7, 1999, and suggests that it could have been scheduled earlier to avoid a conflict with her examination.

I do not repeat all the alleged incidents here. They are outlined with some specificity in the parties’ memoranda.

Despite the objective standard that applies in evaluating sexual harassment, this rule may in some ways, punish the “strong” woman who is subjected to sexual harassment by requiring that the conduct affect her ability to do her job: the stronger the woman, the higher the threshold for a defendant’s liability.

There is no dispute that Core-Boykin's evidence satisfies the required elements that a) she is in a protected status having filed a complaint; and b) Edison had notice of the charge. MacCormack v. Boston Edison Company, 423 Mass, at 663.