COMMONWEALTH *VS.* JARIN PEREZ.[1]

Bristol. February 11, 2005. - April 27, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Evidence,* Consciousness of guilt, Cross-examination. *Constitutional Law,* Jury, Trial by jury. *Practice, Criminal,* Argument by prosecutor, Instructions to jury, Capital case. *Homicide. Malice.*

At a criminal trial, the judge did not err in admitting evidence that the defendant and two others had assaulted one of the Commonwealth's key witnesses, where such evidence was relevant to the issue of the defendant's consciousness of guilt, and where the judge gave comprehensive instructions to the jury on their use of such evidence. [147-148]

At a criminal trial, the judge did not improperly limit the defendant's cross-examination of a Commonwealth witness in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, in light of the speculative, collateral, and potentially prejudicial subject matter that would have been opened up by requiring the witness to answer the questions put by defense counsel. [148-150]

At a murder trial, two of the prosecutor's statements in closing argument, while technically inaccurate, did not give rise to reversible error, where the defendant seasonably objected to the statements, where the judge instructed the jury that closing arguments were not evidence, and where the statements either would not, in the circumstances, have affected the jury's conclusions or were limited to collateral issues in the case. [150-153]

At a murder trial, the judge's instructions to the jury on malice as it applied to deliberately premeditated murder did not give rise to a substantial likelihood of a miscarriage of justice, and the judge's instructions regarding jury unanimity did not violate the defendant's right to trial by jury. [153-156]

INDICTMENT found and returned in the Superior Court Department on October 15, 2001.

The case was tried before *Richard J. Chin,* J.

*Donald A. Harwood* for the defendant.

*Sharon L. Sullivan-Puccini,* Assistant District Attorney, for the Commonwealth.

---

[1]As is our custom, we spell the defendant's name as it appears on the indictments.

CORDY, J. A jury found the defendant, Jarin Perez, guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal, Perez argues that (1) the trial judge erred in admitting evidence of an assault on one of the Commonwealth's witnesses, and in limiting the cross-examination of another; (2) the prosecutor's closing argument was based on facts not in evidence; and (3) the final instructions given to the jury were erroneous in two respects. Finally, he asks us to exercise our power under G. L. c. 278, § 33E, to reverse his murder convictions. After considering Perez's arguments, and undertaking a complete review of the trial record pursuant to G. L. c. 278, § 33E, we affirm his convictions.

1. *Background.* The evidence adduced for consideration by the jury included the following. Just before 4 P.M. on July 13, 2001, a driver returning home from work noticed a motor vehicle parked sideways in the middle of Bell Rock Road in Fall River. Its engine was still running. A bullet had pierced a hole through the driver's side window, the passenger side door was ajar, and a body lay on the ground fifty yards north of the vehicle. In response to a 911 call, the police arrived shortly thereafter. Lisandro Medina, also known as "Choko," was found dead, slumped over in the driver's seat. He had suffered two gunshot wounds to his forehead and a single gunshot wound to the back of his left shoulder.[2] The victim found lying on the ground, Edward Negron (also known as "Ti-Ti"), had suffered a fatal gunshot wound to the back of his head and four gunshot wounds to his back.[3]

Four discharged cartridge casings and four spent bullets were recovered from the crime scene.[4] The Commonwealth's ballistics expert testified that all of the casings were fired from a

---

[2]The forensic pathologist who conducted the autopsies on the two victims testified that the two gunshot wounds to Lisandro Medina's forehead were instantly fatal. The gunshot wound to Medina's left shoulder was rapidly fatal, meaning that a person could live for several minutes with the injury. Toxicology testing indicated that Medina had heroin in his blood at the time of death.

[3]The gunshot wound to Edward Negron's head, which was instantly fatal, passed through and tore the brain.

[4]Three of the spent bullets were removed from Medina's body during an autopsy and another was discovered in the ground under Negron's body.

weapon designed for .30-caliber class ammunition (such as an M-1 rifle), and that the rifle markings on the spent bullets were "almost exclusively unique" to having been fired from an M-1 carbine rifle.

A week before the shootings, Perez bought an M-1 carbine rifle, a clip, .30 caliber ammunition, and a camouflage carrying case from Jerome Moton for approximately $400 in cash.[5] On July 11, Perez showed the rifle to Reny Gonzalez, a friend and neighbor. Perez asked Gonzalez to store the rifle in his basement "for a little while." The following day, Perez returned to Gonzalez's house to pick it up.

On July 13, at approximately 3:10 P.M., Medina drove to the home of Jeffrey Rutkowski. Negron was a passenger in Medina's vehicle. Medina asked Rutkowski if he could get one-half pound of marijuana for his friends, who were in a white Chevrolet automobile parked behind him. This automobile was driven by Perez's cousin, Julio Quinones.[6] Rutkowski told Medina he would try, and Medina responded that he would telephone him in one hour. Medina drove away at approximately 3:25 P.M., followed by the white automobile. The shootings occurred shortly thereafter.

At approximately 4:45 P.M. that same day, Perez went to Gonzalez's house and asked him to come outside. Perez told Gonzalez that he had gone to the "reservation" (near Bell Rock Road) and "murdered" two people, one of whom was named "Choko."[7] Perez stated that the two individuals were talking about some people that he did not get along with in Puerto Rico, that he became scared, and that "he killed them before

---

[5]There was testimony that two M-1 rifles, four pistols, three steel safes, ammunition, gun cases (including a camouflage case), and other gun-related paraphernalia were stolen from a house in Tiverton, Rhode Island, on July 3, 2001. There was further testimony that one of the two stolen M-1 rifles (and ammunition) was subsequently sold to Jerome Moton, who sold it to a man he identified as Perez, on or about July 6, 2001.

[6]A white Chevrolet Beretta automobile with bullet holes was later spotted by the police at the Maple Gardens housing development in Fall River. A State trooper testified that the vehicle was "under the control of one Julio Quinones and it belonged to his mother."

[7]Reny Gonzalez testified that Perez spoke to him in Spanish. Gonzalez did not speak Spanish fluently, but testified that his comprehension skills were greater than his speaking skills.

they tried to do anything to him." Perez also told Gonzalez that he fired a bullet through the window of the vehicle and that when the man in the passenger seat got out and started running, he shot him as well.

A few days later, Perez told Gonzalez that he felt like the police were watching him, and asked if he could again store his rifle and its carrying case in Gonzalez's basement. Gonzalez agreed. A few days after that, Perez asked Gonzalez to help him dispose of the rifle. Gonzalez and Perez took the rifle, which was now in pieces, out of its case, wrapped it in a pair of jeans, and placed it in a backpack.[8] Gonzalez then walked to a "swamp type" body of water in Fall River and threw the rifle into the water. Two pieces of a rifle were later recovered, but no fingerprints were detected.[9]

The police first interviewed Perez on July 16, 2001. He told them that he had known Medina for approximately two months and that on the day of the shootings he telephoned Medina sometime between 11 A.M. and noon from Quinones's house. He then recalled that in fact he was in the Watuppa Heights section of Fall River at 11 A.M, where he had an in-person conversation with Medina and several other men. Perez also told the police that the last time he was in Quinones's white Chevrolet automobile was on July 6, 2001. On July 25, 2001, when the police questioned Perez a second time, he gave a different version of the events of July 13. He told them that on that morning he went to Quinones's house after breakfast and telephoned Medina at approximately noon. He and Quinones then went in Quinones's white Chevrolet automobile to Watuppa Heights, where they met with Medina and some other persons and discussed purchasing marijuana. Medina made a telephone call and, at approximately 1:30 P.M., Perez and Quinones followed Medina by automobile out of the Watuppa Heights housing

---

[8]During a subsequent search of Reny Gonzalez's apartment, the police seized marijuana, cocaine, and ammunition. In Gonzalez's basement, the police found a camouflage rifle case.

[9]Because of the damaged condition of the rifle, the Commonwealth's ballistics expert was unable to determine whether the bullets recovered from the scene and Medina's autopsy were fired from this particular weapon. The serial number, however, matched the serial number of one of the M-1 rifles stolen from Tiverton, Rhode Island.

development to Rutkowski's house for the purpose of completing a purchase. According to Perez, he and Quinones arrived home at around 1:45 P.M. Perez denied ever having been on Bell Rock Road and denied going to Gonzalez's house later that day. He also initially denied owning a camouflage rifle case, but later, after viewing a photograph of the rifle case seized from Gonzalez's house, stated that it was possibly his and that he used it to carry his BB gun.[10]

2. *Evidence of assault.* Over defense counsel's objection, the judge permitted Moton (the gun seller) to testify that on August 19, 2002, approximately two months before Perez's trial commenced, Perez and two other inmates at the Dartmouth house of correction attacked him as he was coming out of the shower.[11] Perez hit Moton with a mop bucket and a wringer and, several days later, after Moton was released from the infirmary, told him that "if [he] be cool, [Perez would] be cool." Perez contends that the admission of this evidence was error.[12]

"It is well established that evidence regarding threats or intimidation of key witnesses for the prosecution is admissible to demonstrate consciousness of guilt." *Commonwealth* v. *Scanlon*, 412 Mass. 664, 676 (1992). Although Perez maintains that this evidence was uncorroborated and unreliable, "the determination of where the truth lies is the province of the jury." *Id.* at 677. The judge gave comprehensive instructions on consciousness of guilt evidence (which this was), reminding the jury that "there may be numerous reasons why an innocent person might

---

[10]A BB gun was recovered during a search of Perez's house.

[11]Jerome Moton testified that he had arrived at the Dartmouth house of correction approximately twenty minutes before the encounter with Perez.

[12]Perez filed a motion in limine to preclude the Commonwealth from introducing any evidence related to this altercation. This motion was denied by the judge after hearing from both defense counsel and the Commonwealth prior to jury selection. The prosecutor had contended that this evidence indicated "clear consciousness of guilt" and that "[i]f the defendant wishes to offer another explanation for it, the [c]ourt should certainly allow him to do that, but the Commonwealth should have the opportunity to offer it." At trial, defense counsel objected only to Moton's testimony concerning what Perez told him after the assault. On appeal, the Commonwealth does not contend that Perez failed to preserve his general objection to the admission of evidence of the altercation.

do such things. Such conduct does not necessarily reflect feelings of guilt."[13] There was no error.

3. *Cross-examination.* Perez argues that the judge improperly limited his cross-examination of Detective Anthony Elumba of the Fall River police department, the lead detective assigned to the case, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to United States Constitution and art. 12 of the Massachusetts Declaration of Rights. After eliciting Elumba's testimony that the police interviewed a significant number of people in connection with the murders, resulting in several leads, defense counsel asked: "And you learned of such things, again, of the poor victims — we'll call them just for easy recognition Choko and Ti-Ti — had some involvement with some individuals in Providence, fair?" The question triggered an objection from the prosecution, which was sustained on hearsay grounds.

During a sidebar conference, defense counsel contended that he should be allowed to pursue this line of inquiry because several witnesses had told the police that Medina and Negron stole drugs from Dominican drug dealers, including a person named Raoul, in Providence, thus raising the possibility that somebody other than Perez was responsible for the murders. The judge asked defense counsel if he was going to present any witnesses to testify on this subject, to which defense counsel responded, "Well, I don't think we can get into, Judge, whether or not this fellow, the Dominican, Raoul, did it, but I think it goes — this isn't my only focus — into the *Bowden* type instruction." See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980) (failure of authorities to conduct certain tests or produce certain evidence "permissible ground on which to build a defense in the circumstances"). The judge noted that if

---

[13]The judge also stated:

"The defendant is not charged with committing any crime other than the crimes charged in this indictment. You have heard mention of other acts done by the defendant, including an alleged assault on one of the witnesses. You may not take that as a substitute for proof that the defendant committed the crime charged, nor may you consider it as proof that the defendant has a criminal personality or bad character."

he permitted defense counsel to elicit this information through his questioning of the detective, the prosecutor would have to be permitted to ask why the detective excluded these other individuals as possible suspects.[14] The judge concluded, "That's going to open the door. I'm not going to allow you to do that."

The judge did not improperly limit Perez's right to cross-examine Elumba. "The right to cross-examine is not absolute, but is subject to the judge's broad discretion." *Commonwealth v. Lucien*, 440 Mass. 658, 663 (2004). In determining whether Perez's constitutional right to confront Elumba was denied because of "an unreasonable limitation of cross-examination," we weigh two factors: (1) the "materiality of [Elumba's] direct testimony," and (2) the "degree of the restriction on cross-examination." *Commonwealth v. Knight*, 437 Mass. 487, 496 (2002), quoting *Commonwealth v. Miles*, 420 Mass. 67, 72 (1995). On direct examination, Elumba testified that as the lead detective he had spent considerable time at the crime scene on the day of the murders. Elumba was then extensively cross-examined on the adequacy of his investigation.[15] When viewed in the entirety of the examination, it cannot be said that Perez was denied his "right to expose inadequacies of [the] police investigation,"[16] *Commonwealth v. Reynolds*, 429 Mass. 388, 391 (1999), or that the judge abused his discretion in sustaining

---

[14]The prosecutor added: "I should also note that of these witnesses, some of them indicated that Mr. Perez was hired as an assassin by people in Providence. I consider that about as likely as these other rumors."

[15]Among other things, defense counsel elicited testimony that Negron's relatives had expressed concern about the quality of the police investigation after finding a shell casing at the crime scene at least one day after the murders, and was permitted to question Elumba as to why the Commonwealth's key witnesses were not charged with drug possession charges after searches of their homes uncovered narcotics.

[16]In addition to testimony elicited from Detective Elumba, defense counsel extensively cross-examined the State police crime scene investigators, eliciting testimony that cigarette butts found at the crime scene were not sent to the Federal Bureau of Investigation for testing, that a beer can found near Negron was never collected and processed for evidence, and that no shoe impressions were taken from the surrounding woods. In his closing argument, defense counsel told the jury:

> "[P]art of your deliberations should consider the quality of work that is going on while going into this case, because the quality of work and the entire package is what's going to be served to you at trial. And

the Commonwealth's objection in light of the speculative, collateral, and potentially prejudicial subject matter that would be opened up by requiring this witness to answer the questions put by defense counsel. *Commonwealth* v. *Jordan,* 439 Mass. 47, 55 (2003) ("As long as the judge does not completely bar inquiry into a relevant subject he has broad discretion to limit the scope and extent of the inquiry"). See *Commonwealth* v. *Doherty,* 371 Mass. 413, 417-418 (1976) (judge properly limited cross-examination where proposed testimony related to collateral issue and "creat[ed] dangers of confusion and prejudice outweighing . . . value as legitimate proof"). There was no error.

4. *Prosecutor's closing argument.* Perez contends that the prosecutor twice misstated the evidence in closing argument and that the errors require reversal of his convictions. Toward the end of his summation, the prosecutor stated that Perez had told a witness that he "chased [Negron] down" Bell Rock Road before shooting him in the head. The prosecutor also argued that Perez had said that he "had to kill [Negron and Medina] before they killed [him]." At the conclusion of the closing argument, defense counsel objected to both statements, which were, in fact, technically inaccurate. The witness, Gonzalez, actually testified as follows: "[Perez] told me he shot through the window. [Negron] was in the passenger seat. *He got out and started running and [Perez] shot him too.* [Perez] was telling me that he did it because supposedly [Negron and Medina] were talking about some people that he didn't get along with, back where he lived. So, he felt kind of scared. So, he killed them *before they tried to do anything to him.*" (Emphasis added.)

"[P]rosecutors are held to a stricter standard of conduct than are errant defense counsel and their clients." *Commonwealth* v. *Arroyo,* 442 Mass. 135, 147 (2004), quoting *Commonwealth* v. *Kozec,* 399 Mass. 514, 519 (1987). Insofar as the prosecutor misstated Gonzalez's testimony in closing argument, it was error.[17] See *Commonwealth* v. *Coren,* 437 Mass. 723, 730 (2002)

that's what's being served to you this week and ultimately today for you to take back and determine."

[17]After oral argument, the Commonwealth filed a motion to expand the record. A State police report attached to the motion indicates that Gonzalez, dur-

("Prosecutors must limit the scope of their arguments to facts in evidence and inferences that may be reasonably drawn from the evidence"); *Commonwealth* v. *Good*, 409 Mass. 612, 623 (1991) ("prosecutor should not . . . misstate the evidence or refer to facts not in evidence"); *Commonwealth* v. *Kozec*, *supra* at 522 ("Arguments that are unsupported by the evidence . . . are, of course, improper"). Whether it is reversible error depends on our consideration of "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000).

Applying these four factors to the "chase" reference, Perez made a timely objection at the conclusion of the prosecutor's argument, and the judge's instructions did not include any specific correction of the prosecutor's misstatement of the evidence.[18] The judge did instruct, however, that closing arguments were not evidence and that the jury were to follow their own recollection of the witnesses' testimony. See *Commonwealth* v. *Dagley*, 442 Mass. 713, 725 (2004), cert. denied, 125 S. Ct. 1668 (2005) ("That the judge's final instruction did not include any express correction of the prosecutor's mischaracterization does not mean that the instruction was inadequate to cure any confusion caused by that mischaracterization"). Although the question whether Perez "chased [Negron] down" was not collateral to the Commonwealth's theories of murder in the first degree, "the final (and most important) factor" weighs heavily in favor of the Commonwealth. *Id.*

ing an interview with the State police, stated that Perez had told him that he "chased the other guy and shot him." This report was not admitted in evidence at trial and the Commonwealth now concedes that the prosecutor misstated the evidence in attributing this language to Perez. It is apparent from the record, however, that the prosecutor, presumably relying on this report, fully expected Gonzalez to testify in this manner, and specifically referenced it in his opening statement. There is no evidence to suggest bad faith or intentional misconduct on his part.

[18]It is clear from the transcript that the judge did not believe that the prosecutor had misstated Gonzalez's testimony.

The evidence with respect to the shooting of Negron is as damning, if not more so, than the prosecutor's misstatement of a snippet of Gonzalez's testimony. Gonzalez testified that Perez said that Negron got out of the passenger seat and started running and that Perez shot him. The Commonwealth's forensic pathologist testified that Negron would have dropped to the ground as soon as he was shot in the back of the head. He also testified that bruising surrounding three of the exit wounds on Negron's torso indicated that these additional gunshot wounds were inflicted when Negron was against "something hard and flat," like the ground. Based on this evidence, the prosecutor could have properly argued (and the jury reasonably inferred) that Perez shot Negron once in the back and once in the head as he ran from the vehicle, then, when Negron fell to the ground, Perez shot him repeatedly in the back as he lay there. In light of this evidence, we are satisfied that the prosecutor's reference to Perez having "chased" Negron would not have affected the jury's conclusions.[19]

Applying the same factors to the prosecutor's second comment, we reach the same conclusion. Perez again seasonably objected to the prosecutor's argument, and the judge gave only a general instruction that closing arguments of counsel are not evidence. In this instance, however, we agree with the Commonwealth that the prosecutor's error was limited to the collateral issue of motive. "[E]vidence of motive was not a necessary element of proof," *Commonwealth* v. *Lucien*, 440 Mass. 658, 666 (2004), and was a subject barely touched on either during the testimony at trial or in the closing statements of counsel.[20] Contrast *Commonwealth* v. *Pavao*, 34 Mass. App. Ct. 577, 581-583 (1993) (prosecutor's argument that defendant said

[19]Indeed, the prosecutor could have argued that the jury could infer from the evidence that Perez chased Negron down and shot him. What he could not do is argue that the testimony was that Perez said he had done so.

[20]Specifically, the prosecutor argued: "And what does this man say as to why? Well, we may never know exactly why, but the statement is, 'I had to kill them before they killed me.' "

Defense counsel's closing argument focused on challenging the credibility of Gonzalez, touching on the issue of motive only once: "Do you have a motive? The only thing we have heard in this courtroom for five days is that they were friends. There was never harsh words or any discomfort. That's what you have."

he was going to "kill" victim, instead of "get" victim, reversible error because "it attributed the intent necessary for murder to the defendant"). Moreover, the misstatement was arguably less prejudicial to Perez than Gonzalez's actual testimony and, in any event, could not possibly have made a difference in the jury's conclusions.

5. *Jury instructions.* Finally, Perez contends that the judge erred in certain of his jury instructions. First, Perez claims that the judge did not give a proper instruction on malice as it applies to deliberately premeditated murder because he charged the jury that they could "infer that a person who intentionally uses a dangerous weapon on another person is acting with malice" and that a "dangerous weapon is an item that is capable of causing serious injury or death." Perez maintains that this instruction was error "because malice in the context of a charge on deliberate premeditation is limited to an intent to kill, *not* merely an intent to do serious bodily harm." There was no objection to the instruction, and thus the standard of review is whether any error created a substantial likelihood of a miscarriage of justice.

It is well established that the "jury are permitted to infer malice from the use of a dangerous weapon." *Commonwealth* v. *Guy,* 441 Mass. 96, 107 (2004), even in connection with first prong ("intent to kill") malice. *Id.* See *Commonwealth* v. *Reaves,* 434 Mass. 383, 393 n.16 (2001) (instruction that malice may be inferred from intentional use of dangerous weapon correct supplemental instruction on first prong malice); *Commonwealth* v. *Albert,* 391 Mass. 853, 860-861 (1984) ("Certainly, the jury were *entitled* to infer malice from the intentional use of a deadly weapon, so long as the judge's instructions did not compel them to do so"). The judge's charge tracked the language of our model instructions. See Model Jury Instructions on Homicide 8, 61 (1999). There was no error.

Perez also argues that the judge erred by failing to instruct the jury that they must reach a unanimous verdict with respect to any *Cunneen* factor relied on to support a conviction of murder in the first degree under the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983). We have repeatedly rejected this argument. See *Com-*

monwealth v. *Rice*, 441 Mass. 291, 302 (2004); *Commonwealth* v. *Moses*, 436 Mass. 598, 605-607 (2002); *Commonwealth* v. *Obershaw*, 435 Mass. 794, 809 (2002); *Commonwealth* v. *Hunter*, 427 Mass. 651, 657-658 (1998). Perez contends, however, that the United States Supreme Court's decisions in *United States* v. *Booker*, 125 S. Ct. 738 (2005); *Blakely* v. *Washington*, 542 U.S. 296 (2004); *Ring* v. *Arizona*, 536 U.S. 584 (2002); *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000) (*Apprendi*); and *Richardson* v. *United States*, 526 U.S. 813 (1999), require reconsideration of this issue. We are not persuaded.

We previously have held that *Richardson* v. *United States, supra* at 815 (requiring jury unanimity as to particular offenses that constitute "elements" of "continuing criminal enterprise" under Federal law), and *Apprendi, supra* at 490 (requiring jury to find beyond reasonable doubt any fact that increases criminal penalty beyond statutory maximum, other than fact of prior conviction), are inapplicable because the *Cunneen* factors underlying the theory of extreme atrocity or cruelty "are neither elements of the crime nor separate theories of culpability, but 'evidentiary considerations' that guide a jury in determining whether a murder was committed with extreme atrocity or cruelty," *Commonwealth* v. *Moses, supra* at 605-606. See *Commonwealth* v. *Obershaw, supra* at 809. They are analogous to the "means" by which the element of extreme atrocity or cruelty can be satisfied. The Supreme Court has been quite clear that neither the Sixth, Eighth, nor Fourteenth Amendment to the United States Constitution requires that a jury be unanimous as to the "means" by which an element of the crime is proved. *Richardson* v. *United States, supra* at 817.[21] *Schad* v. *Arizona*, 501 U.S. 624, 631-632 (1991) (plurality opinion). The other decisions to which Perez cites are similarly of no assistance to him.

---

[21]*Richardson* v. *United States*, 526 U.S. 813, 817 (1999), is particularly illuminating, as it distinguishes the element of a crime from the "underlying brute facts" that make it up. Using robbery as an example, the Court reasoned that an "element" was the use or threatened use of force and hence must be found unanimously, but the "underlying brute facts" by which the element could be satisfied, such as whether the use or threatened use of force was accomplished by means of a gun, or a knife, or by any other form of physical force, did not require unanimity. In other words, it simply makes no difference if some jurors find that a knife was used and others a gun, so long as there is unanimity on the use or threatened use of force.

In *Ring* v. *Arizona, supra* at 609, the Supreme Court held that the Sixth Amendment right to trial by jury, as construed by *Apprendi*, is violated when a State capital sentencing scheme allows a "judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." The trial judge had sentenced Ring to death based on his finding of two aggravating factors, including a finding that the murder was committed "in an especially heinous, cruel or depraved manner." *Id.* at 594-595. Although the Court held that this aggravating circumstance constitutes "the functional equivalent of an element of a greater offense" and is consequently for the jury to find, it did not go so far as to hold that a jury must be unanimous on evidentiary factors supporting a finding of such an aggravating factor. *Id.* at 609, quoting *Apprendi, supra* at 494 n.19. We decline to conclude "that the absence of a requirement that the jury be unanimous as to the applicable *Cunneen* factors violates principles of due process." *Commonwealth* v. *Moses, supra* at 606.

Nothing in *Blakely* v. *Washington, supra,* or *United States* v. *Booker, supra,* persuades us to accept Perez's argument. In *Blakely* v. *Washington, supra* at 303, the Court reversed an enhanced sentence imposed by a judge on the basis of his finding that the crime was committed with "deliberate cruelty," a statutorily enumerated ground for departure. In doing so, the Court merely reaffirmed the proposition that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment' . . . and the judge exceeds his proper authority" (citation omitted). *Id* at 304. In *United States* v. *Booker, supra* at 756, the Court held that the *Apprendi* line of cases applies to the Federal sentencing guidelines, and, consequently, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." The Court therefore held that the Sixth Amendment protects a "defendant's right to have the jury [rather than a judge] find the existence of 'any particular fact' that the law makes essential to his punishment" (citation and quotations

omitted). *Id.* at 749. This line of cases "does not require that there be unanimity on every evidentiary factor supporting an element of a crime." *Commonwealth* v. *Obershaw, supra* at 809. Here, the jury unanimously found beyond a reasonable doubt that Perez murdered Medina and Negron with extreme atrocity or cruelty. We thus conclude that Perez's convictions did not violate his right to a trial by jury.

6. *G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and we find no reason to exercise our authority to reduce the jury's verdicts or to order a new trial.

*Judgments affirmed.*